STATE OF MONTANA on the relation of HERBERT P. BURNS, Relator and Appellant, v. THE CITY OF LIVINGSTON, Montana, a Municipal Corporation, the City Council of the City of Livingston, et al., Respondents and Respondents.

No. 10615.

Submitted January 16, 1964. Decided September 28, 1964.

395 P.2d 971.

Neil S. Keefer and Lee Overfelt, Billings, Neil S. Keefer (argued), Billings, for appellant.

Jack Yardley (argued), Livingston, for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment and decree which denied the relator Burns any relief and ordered a writ of review quashed, the Honorable Victor H. Fall, presiding. Relator Burns had sought review of proceedings of the City Council of Livingston which had discharged Burns from the Livingston Fire Department.

Respondents are the City of Livingston, its mayor and aldermen, hereafter collectively referred to as either Respondents or the City.

Appellant Burns (relator below) was a member of the organized fire department of the City for about twelve years, and for the last four or five years had been the Fire Chief.

On August 13, 1962, at a regular meeting of the City Council, the fire and police committee of the council reported a recommendation that appellant Burns be demoted from the position of fire chief to fireman, and that the mayor be instructed to

have the city attorney prepare the necessary charges and serve a copy on Burns, specifying September 4, 1962, as the hearing date. Subsequently, on August 27, 1962, a written specification of charges was prepared and served on Burns. Burns, at the time and since June or July of 1962, had been on sick leave.

The written charges were general in character, charging essentially:

(1) Failure to keep proper and adequate records and accounts pertaining to the affairs of the Fire Department.

(2) Failure to exercise proper leadership and maintain discipline.

(3) Personal conduct unbecoming a fire chief.

The hearing on the projected demotion of the fire chief to fireman was not held on September 4, 1962, as scheduled because of illness of the city attorney.

The postponement was specifically waived by Burns' counsel. On January 5, 1963, a notice of hearing was served on Burns of a hearing to be had on January 10, 1963.

Prior to the city council meeting of August 13, 1962, Burns had informed members of the fire and police committee that if he were not fit to be chief, he was not fit to be a fireman and informed the council that he would rather be discharged than demoted.

On January 10, 1963, a hearing was had by the city council. Burns and his counsel were present. Objection to proceedings were made by counsel for Burns on these grounds:

(1) Burns had not been "suspended" as fire chief and hence the council had no jurisdiction.

(2) The charges levied were so general that it was impossible to prepare a defense.

(3) Three members of the council who made the charges as members of the fire and police committee were sitting in judgment.

Burns had filed an answer generally denying the charges.

The hearing was held and subsequently by vote of the council, Burns was discharged. Burns then sought a writ of review in the district court, where on an agreed statement of facts and upon stipulation as to the exhibits and record of proceedings before the city council, the district court quashed the writ and denied relief to Burns. Judgment was entered and this appeal followed.

The Specifications of Error are:

(1) The Livingston City Council was without jurisdiction to conduct the hearing on January 10, 1963, because the Mayor of the City of Livingston had not first suspended appellant, such suspension being a condition precedent required by section 11-1903, R.C.M.1947, thereby voiding the discharge of appellant.

(2) The Livingston City Council did not have before it "substantial evidence" to warrant discharging appellant from the Livingston Fire Department.

(3) Appellant has been deprived of his property right in his job and retirement benefits within the provisions of section 67-201, R.C.M.1947, defining property, and Article III, Section 27 of the Constitution of the State of Montana, providing that no person shall be deprived of property without due process of law.

R.C.M.1947, § 11-1902, provides:

*"Fire department to consist of what—compensation.* Such fire department, when established, may consist of one chief of the fire department, as many assistant chiefs of the fire department, and such number of firemen as the council or commission may from time to time provide, and may also include a city electrician, and as many assistant electricians as the council or commission may from time to time provide. The compensation of the chief of the fire department and assistant chiefs of the fire department and firemen, in cities and towns where the council or commission shall establish a paid fire department, and said city electrician and assistant city electricians, shall be

fixed by ordinance. The mayor or manager shall nominate, and, with the consent of the council or commission, appoint the chief of the fire department, and assistant chief or chiefs of the fire department, and all firemen, and each appointment shall be first made for a probationary term of six (6) months, and thereafter the mayor or manager may nominate, and, with the consent of the council or commission, appoint such chief and assistant chief or chiefs of the fire department and firemen, who shall thereafter hold their respective appointments during good behavior, and while they have the physical ability to perform their duties. The chief of the fire department, and the assistant chief or chiefs of the fire department, and the firemen, shall not be deemed officers of the municipal corporation in which such fire department is established."

R.C.M.1947, § 11-1903, provides:

*"Powers of mayor or manager to suspend firemen.* The mayor or manager may suspend the chief and assistant or any fireman of the fire department for neglect of duty or a violation of any of the rules and regulations of the fire department; the chief of the fire department may suspend the assistant chief of the fire department or any fireman, and the assistant chief of the fire department may suspend any fireman for a like cause. In all cases of suspension the person suspended must be furnished with a copy of the charge against him in writing, setting forth reasons for the suspension, and such charges must be presented to the next meeting of the council or commission and a hearing had thereon, when the suspended member of the fire department may appear in person or by counsel and make his defense to said charges; if such charges are found proven by the council or commission, the council or commission, by a vote of a majority of the whole council or commission, may impose such penalty as it shall determine the offense warrants, either in the continuation of the suspension for a time limited, or in the removal of the suspended person from the fire department; should the charges be not presented to the next meeting of the

council or commission after the suspension, or should the charges be found not proven by the council or commission, the suspended person shall be reinstated and be entitled to his usual compensation for the time so suspended. This act shall apply to organized fire departments in every city and town of the State of Montana regardless of the form of government under which said city or town may be operating or may at any time adopt."

It is appellant's argument that the language appearing in section 11-1903, to the effect that the "mayor or manager may suspend the chief" and that in "all cases of suspension the person suspended must be furnished with a copy of the charge against him in writing," sets up as a condition precedent that before a hearing or even formal charges can be had, the mayor *must* suspend. Such, of course, is not what the legislature has said. It used the word *may,* and logically this seems entirely proper. In the instant case, Burns was on sick leave, there was no cause to suspend, and in any event Burns certainly was not prejudiced by not being suspended. Of course, too, in instances that readily come to mind such as intoxication at the scene of a conflagration, the use of suspension might be required.

Appellant cites as authority State ex rel. Driffill v. City of Anaconda, 41 Mont. 577, 111 P. 345, for the proposition that "suspension is a condition precedent" to the council having jurisdiction. What was said in that case at p. 581, 111 P. at p. 347 was:

"3. In order to dispense with the services of the relator against his will, it was incumbent upon the city to pursue the mode prescribed by section 3328 [Rev.Codes 1907, now section 11-1903, R.C.M.1947] or section 3329 [Rev.Codes 1907, now section 11-1904, R.C.M.1947]. Section 3328 is a disciplinary measure. It provides for the removal of a fireman for cause; but, as a condition precedent to such removal, charges in writing must be preferred to the council, a hearing had, and the accused found guilty."

Thus, we see there that the charges in writing and opportunity for hearing are required; not that any suspension *must* be made first. We find no merit in Specification of Error No. 1.

Next, appellant contends there was not sufficient "substantial evidence" to warrant being discharged. As to this contention, counsel for appellant terms the record, "at best it is silly."

Excerpts of the minutes of the City Council show that on August 13, 1962, the following proceedings were had:

"Mayor Ommundsen then advised the City Council that it was the recommendation of the Fire and Police Committee that Mr. H. P. Burns be demoted from the position of Fire Chief to Fireman and that the Mayor be instructed to have the City Attorney prepare the necessary charges and a copy be served on Mr. Burns, specifying September 4, 1962, as time that public hearing will be heard.

"Discussion was had on this matter between the Mayor and Mr. Burns, who was present and also questions asked by members of the City Council were answered at this time as to what the charges would constitute. Mr. Burns was informed it was his prerogative and privilege to secure legal counsel so defense may be made by him as to whether the charges are justified.

"Motion was made by Alderman Waldum seconded by Alderman Latsch that recommendation of the Fire and Police Committee be accepted. * * *

"At this time, Mr. David B. Fitzgerald, appeared on behalf of Mr. H. P. Burns and he stated he would consent to a continuation of hearing of charges upon five (5) days advance notice, by the City Council, and that the charges can be heard and he would waive all statutory requirements and that charges be heard at this meeting and he requested that charges be heard at a time to be fixed by the City Council on five (5) days written notice to Mr. H. P. Burns.

"Motion was then made by Waldum seconded by Alderman McGonegal that the statement of Mr. David B. Fitzgerald be accepted. Motion carried."

Following this, and on August 27, 1962, Burns was served with Specifications of Charges in part as follows:

"* * * charge that *Herbert P. Burns, presently Chief of the Fire Department* * * * *has been guilty of neglect of duty, misconduct in office, conduct unbecoming the Chief of the Fire Department, and conduct such as to bring reproach upon the Fire Department of the City of Livingston, Montana, in that:*

"(I)   That the said Herbert P. Burns, as Chief of the said Fire Department, has failed and neglected to keep proper and adequate records and accounts pertaining to the members of the Fire Department, and of himself, as Chief thereof.

"(II)   That he has failed to exercise proper leadership and initiative in maintaining the discipline, morale, good order and proper conduct of the officers and firemen, constituting the Fire Department.

"(III)   That on numerous occasions his personal conduct has been such as to constitute conduct unbecoming a fire department chief, misconduct in office, and conduct such as to bring reproach upon the Fire Department of the City of Livingston, Montana.

"All of which is contrary to the form, force and effect of section 11-1902, R.C.M.,1947, and constitutes neglect of duty, misconduct in office, and conduct unbecoming a Fire Chief, and conduct such as to bring reproach upon the Fire Department of the City of Livingston, Montana.

"WHEREFORE, the undersigned, as such Fire and Police Committee * * * pray that the City Council * * * hold and conduct a hearing on the above charges * * * and that at such hearing the City Council take such action as it may deem necessary and proper."

As previously related, Burns filed a general denial and objected to the proceedings as quoted. It is stated in respondents' brief and during oral argument, without contradiction, that Burns had on several occasions stated he would rather be discharged than demoted. The charges pray for "such action as it

may deem necessary and proper" rather than just demotion as formerly contemplated at the meeting of August 13.

Some four and one half months later the hearing was held. To describe the conduct of the hearing, the record reveals:

"Gentlemen, at this time this is not a court of law. This is a hearing that is accorded to hear the defense of Mr. Herbert P. Burns. I intend to conduct the meeting to the very best of my ability to be fair to bring out all the points pertinent to these questions. If at any time you gentlemen wish to call any witness to have anyone heard, that is your privilege. Mr. Yardley, do you want to make any statement? Mr. Fitzgerald?

"MR. FITZGERALD: Yes, if I might, at this time before we start. Mr. Mayor and gentlemen of the Council, in behalf of Mr. Herbert P. Burns I would like to object at this time to any hearing under this specifications of charges so called as filed here. They purport to be drawn under Section 11-1902 of the Revised Codes, and if I may just very briefly I'll tell you what my point is and then I won't labor it any further. That statute provides that the Mayor may suspend the chief and any assistant or firemen in the fire department for neglected duty. Further, that in all cases of suspension the person suspended must be furnished with a copy of the charges against him, in writing, setting forth reasons for the suspension, and such charges must be presented at the next meeting of the council and a hearing had thereon where the suspended member may appear in person and make his defense. If such charges are found proved by the council the council may by a vote of the majority of the whole council impose such penalty as it shall determine the offense warrants. There has been no suspension of Mr. Burns here and I don't believe that there can be any charges heard by this council until there has been a suspension. The minutes of the council meeting relative to that on August 13th were that Mayor Ommundsen advised the City Council that it was a recommendation of the Fire and Police Committee that Mr. H. P. Burns be demoted from the position of Fire Chief to fireman and that the

Mayor instructed to have the City Attorney to prepare the necessary charges and a copy served on Mr. Burns specifying September 4th, 1962 as a time when the public hearing would be heard. I don't believe that that is any compliance of a suspension made by the Mayor of Mr. Burns, and if that be the case, and if I am correct, there can be no charges heard at this meeting tonight.

"My second point in regard to the specifications of charges is that they are so general that they don't advise in fact Mr. Burns of the charges against him. They are drawn on the terms of the statute and they are very general.

"My third point is that I don't believe there is a quorum of the council present that is able to sit in judgment because the charges were made by three members of this council. And I don't think that they can sign charges against a person and then sit in judgment of those charges. If that is true there are only four members of the council here. So we object further on that ground with proceeding with this matter tonight. In general those are my objections.

"MR. YARDLEY: We feel under the circumstances, Dave, that there was a suspension of the Fire Chief; and secondly, that the charges in writing—I mean, they are not necessarily the facts, but I don't believe you are required to do that. The object is to present the facts of the situation, I think, and to allow Mr. Burns to produce his defense to that.

"MR. FITZGERALD: Might I ask this then, if this hearing, as it proceeds, will these charges be put in first so we know what we have to answer?

"MAYOR OMMUNDSEN: Yes.

"MR. YARDLEY: Thirdly, I believe there is no statute or anything in regards to the members of the Fire Commission depriving them of the right to sit here, at least under a police hearing under the Metropolitan Police Act. Our court has so held, I believe Dave; there is nothing to prevent them from doing it.

"MR. FITZGERALD: I just wanted to make these points for the record. Having made those, also, for the record I would like to file this answer to charges which constitutes just a specific denial of the charges in general language, just to get them in the record so we have an issue to work on here.

"MR. YARDLEY: Let me suggest this Mr. Mayor, you have certain charges that have come to your attention. I am going to suggest this, Dave, that the Mayor read certain information that has come to his attention, just to read it, and then we are going to produce certain witnesses to substantiate other portions of this.

"MR. FITZGERALD: I contemplated too here Jack not particularly going through this with Mr. Burns in question and answer form. He is here to answer, and any questions that you might have—I don't plan to formally put in a particular case.

"MR. YARDLEY: Also, it is our thought that any member of the Council that has any questions to direct to any witnesses they should do that, and if there is no witness produced that they think should be here that they should request that. Now, that's a little bit similar to a coroner's jury. Also, the Mayor is authorized to give oaths. If there are any objections he'll have to rule upon them, but he will administer oaths to any witness. I would suggest, Mr. Mayor, that you read the information you have and then we will develop this case with our other witnesses.

"MAYOR OMMUNDSEN: Under numerous occasions his personal conduct has been such as to constitute conduct unbecoming a fire department chief, misconduct in office, and conduct such as to bring reproach upon the fire department of the City of Livingston, Montana. I find that you did permit your driver's license to lapse.

"MR. FITZGERALD: I am going to have to object to this form, if the council is going to testify to facts, I'd have to ask that they be sworn, Mr. Yardley.

"MR. YARDLEY: We have the problem of who would ad-

minister the oath to him, Dave. I don't know who is qualified to do that. The only one I know that is present here that is qualified to administer oaths is the Mayor and he is the one under our position that made the suspension, and actually it will have to be something he has developed through his own investigation.

"MR. FITZGERALD: Subject to my objecting, you go ahead. I wan the objection noted.

"MAYOR OMMUNDSEN: That your birth date is February 21, 1922. You had a driver's license issued to you on November 20, 1953; your driver's license expired—not necessarily that one, but it expired February 21, 1961. Your new license, you took a test on that January 24, 1962. The license was mailed to you on February 6, 1962. You were without a valid driver's license from February 21, 1961 until February 6, 1962, or 15 days short of one year. This is substantiated by a letter from the Montana Highway Patrol. It's also from records from our Police Department. Your defense?

"MR. FITZGERALD: Would it be simpler as each one of these comes up to let the defense go into it?

"MR. YARDLEY: If you will administer an oath to Mr. Burns.

"HERBERT P. BURNS, testifying in his own behalf, being first duly sworn, saith as follows:

"MR. BURNS: I have no defense against that, no. I know I didn't have a driver's license. I had a permit for about three months of that time but I admit I didn't have a driver's license.

"MR. YARDLEY: May I suggest if any of the councilmen have any questions to present them too at this time. I recognize this is rather informal, but there is no procedure set up for it to my knowledge. If you have any questions if you would, for the benefit of the court reporter, if he does not know you if you would identify yourselves and ask your questions

"MAYOR OMMUNDSEN: Are there any questions?

"MR. BURNS: I have a question before we go on.

"MAYOR OMMUNDSEN: Yes.

"MR. BURNS: The specifications they are right. Might I ask you a question of what has this directly to do with the Fire Department or the running of the Fire Department?

"MAYOR OMMUNDSEN: It has quite a bit. You were during that time operating equipment in the name of the Fire Department. Your own car, you were paid $600.00 a year for the use which put it in city use. Also, the operation of the city trucks, and had something gone wrong the city would have been in a bad position.

"MR. BURNS: The car belonged to me, it didn't belong to the city.

"MAYOR OMMUNDSEN: We were paying you and you were in the hire of the city and it would have put us in a bad light, and it is indicative of poor conduct by allowing your license to lapse. If anyone else happened to get in an accident, and without a driver's license, they are in violation of the law and it's more so of a supervisor of a city department.

"You were and are a part owner of the Cave Bar that has twice been convicted by the State Liquor Board of selling liquor to minors and also has been closed for a period of time on each offense, which is, we maintain, not conduct for a fire chief or a city supervisor.

"MR. BURNS: My defense on that now?

"MAYOR OMMUNDSEN: Yes.

"MR. BURNS: I am not part owner of the Cave.

"MAYOR OMMUNDSEN: You were at that time.

"MR. BURNS: No, I was not, I never have been.

"MR. YARDLEY: You are a licensee though.

"MR. BURNS: That's right, but I'm not an owner of it; anybody can go on the license.

"MR. YARDLEY: For the record I'll say this, you have to have an interest in that to get on the license I believe.

"MR. BURNS: No, sir, you do not.

"MR. YARDLEY: Well then, you haven't any business on that license.

"MR. BURNS: Anyone can go on a license. There is nothing that says in your liquor laws that a man that is on the license has to own any particular part of that business whatsoever.

"MR. YARDLEY: Well then, let's put it this way, that is immaterial then. Again, it is not my part to be arguing with you, you were on that license, you were convicted of a violation and you certainly owed a duty there, that is what I think the Mayor is developing here. There is a duty as a licensee on the liquor or beer license, that is what he is attempting to show.

"MR. BURNS: That's true. I'll admit that, we were convicted of two cases of it. But now, wait a minute, let me put this here, at no time, Mr. Mayor, the Fire Committee, or any fire people or any councilman had ever come to me personally and told me he did not want me working at that Cave, or that they did not want me having anything to do with the bar business. You haven't got a letter, you haven't got one person on this council, or on the previous council when you were a councilman, that come to me personally and told me to quit working over there.

"MAYOR OMMUNDSEN: Mr. Burns, I would like to get something clear right now, this Council is not on trial, we are hearing charges on you.

"MR. BURNS: Don't I have a right to answer?

"MAYOR OMMUNDSEN: You have a right to answer, but do not start intimidating anyone. Just as long as we understand that.

"MR. BURNS: Yes. As I said I have not ever been at any time told that I was not to.

"MAYOR OMMUNDSEN: That is the charge and that is your defense.

"MR. BURNS: That's my defense, yes sir.

"MAYOR OMMUNDSEN: You are also charged—

"MR. FITZGERALD: May I inquire here, who is making these charges, the Police and Fire Committee or you?

"MAYOR OMMUNDSEN: Since this is an informal hearing—

"MR. FITZGERALD: I just wondered.

"MAYOR OMMUNDSEN: We felt that you had made your objection that the Fire Committee had entered these charges.

"MR. FITZGERALD: They are actually the charges of the Fire Committee?

"MR. YARDLEY: May I interpose this, the record shows that the charges were made by the Fire Committee. This is a personal investigation that was conducted by the Mayor.

"MR. FITZGERALD: Was this done before or after the charges were filed?

"MR. YARDLEY: These, I assume, had been substantiated since that time.

"MR. FITZGERALD: Since the charges?

"MAYOR OMMUNDSEN: I had most of these charges, the facts, before at the time of the filing of the charges. I can almost—I have a letter here August the 27th, that was the date that I wrote and got those dates you see; and also the 27th, that is from the Liquor Control Board, and from the Highway Patrol also.

"You were in a bar known as the Deluxe Bar after the required closing hour of 2:00 a.m., which was conduct unbecoming a Fire Chief in our estimation.

"MR. BURNS: That, as I can tell you, and I told you already before, at that time there wasn't a bar in this town that knew the ordinance that you were to have everyone out of the bar at 2:00 o'clock. And at that time if I had known that I could have gone out the back door, George. I went and answered the door and let the policeman in. I was sitting in there waiting to go for breakfast. There wasn't a drink served after 2:00 o'clock and at that time I can assure you there wasn't a bar in town that knew the—the ones that I know of anyhow, that knew that that

ordinance was actually in effect, that you couldn't have anybody in there after 2:00 o'clock. We always went on the assumption that you could not serve a drink after 2:00 o'clock and I assure you if I had known this I either wouldn't have been in there or when they knocked at the door I could have gone out the back door. I was there, I admit it."

The foregoing verbatim record reveals a hearing informal indeed. However, it also reveals a number of things. Burns entered into the discussion, stated under oath that he did the three things charged by the Mayor as being conduct unbecoming a fire department chief. As to the failure to have a driver's license, standing alone it might be a simple neglect of duty, but probably not such a conduct as to substantiate the charge. The quoted exchange concerning the Fire Chief's status as a licensee of a bar, the licensees being convicted twice of selling liquor to minors is most revealing. First of all, our law requires as follows:

R.C.M.1947, § 4-412, states in part:

"No license shall be issued by the board to: * * *

"(7) A person who is not the owner and operator of the business."

R.C.M.1947, § 4-407, requires a verified application and provides a criminal penalty for false statements.

Yet, is is seen from Burn's statements under oath at one place denying ownership, and yet at another admitting that "we" were convicted, and still another no one "told me he did not want me working at that Cave, or that they did not want me having anything to do with the bar business." The exchange reveals conduct unbecoming a fire department chief in his own words: the record reveals that the second conviction for selling liquor to minors resulting in suspension of the liquor license occurred just prior to the initiation of council action.

We shall not dwell further on this other than to say that the City Council had substantial evidence bearing on the written charge previously quoted in the general charge of conduct

unbecoming the Chief of the Fire Department and misconduct in office.

Too, we do not go further in) the two general charges of failure to keep proper records and failing to exercise proper leadership. These were simply not proven.

As to specification of Error 2 we find no merit.

Next the specification of error as to lack of due process. The appellant in this category asserts that the "hearing" was not a hearing at all. To understand what appellant asserts, we shall quote from his brief:

"The three charging members of the fire and police committee sat in judgment on his case. The charges levied against him were so broad as to preclude the preparation of an effective defense. At the hearing before the City Council the Mayor functioned as prosecutor and hearing officer. Appellant was given just barely five days notice of the hearing by the calendar and was precluded from employing the attorney of his choice. The statute setting forth the procedure to be followed was not complied with. The evidence against appellant is not substantial."

We shall answer these assertions sentence by sentence, although not in the same sequence.

As to the three members sitting, section 11-1903 provides the City Council with exclusive jurisdiction. No provision for disqualification is made. See State ex rel. Mueller v. District Court, 87 Mont. 108, 285 P. 928; State ex rel. Holt v. District Court, 103 Mont. 438, 63 P.2d 1026; State ex rel. Yuhas v. Board of Medical Examiners, 135 Mont. 381, 339 P.2d 981.

As to the second point that the charges are so broad as to preclude the preparation of an effective defense, this court has said in State ex rel. Griffiths v. Mayor of City of Butte, 57 Mont. 368, 371, 188 P. 367, 368:

"* * * While the pleading may not have been as accurate in its statements or as artistically drawn as is desirable in a complaint filed in court, such technical accuracy is not required in proceedings had before a body of laymen."

As previously noted under Specification of Error 2, the fire chief actively participated, took over the examination, was fully aware of the proceedings, and was in no way prejudiced. We point out, that of course, this is not a criminal proceeding, nor even a judicial proceeding in any particular. The only requirements here are those provided by statutes previously set forth. We look here to see whether the removed officer was given an opportunity for explanation. He was, and in attempting to explain, spelled out the behavior, or lack of good behavior set forth in section 11-1902.

The assertion that appellant was given just barely five days notice and precluded from employing the attorney of his choice simply is not borne out by the record. He stipulated to the five-day notice. He was represented by counsel. The only basis for such an assertion is a letter from one of counsel from Billings to one of counsel from Livingston advising him that Billings counsel could not be present because of a conflict and asking for 15 days notice. No point appears to have been made of this by counsel for Burns at the hearing, the only objection being those hereinbefore set forth.

As to the last two points made that the statute was not complied with, or that sufficient substantial evidence was not had, we have already answered. Finding no lack of due process, Specification of Error 3 is without merit.

For the foregoing reasons, the judgment of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN CONWAY HARRISON and DOYLE concur.

MR. JUSTICE ADAIR dissenting.

I dissent.

I view the essential facts and the law applicable thereto in a somewhat different light than is expressed in the majority opinion in this cause, hence, I respectfully dissent to such opinion.

At the outset the only testimony taken or evidence introduced

against the relator, Herbert P. Burns, was that presented to and acted upon by the City Council of the City of Livingston with Mayor George Ommundsen of that city, presiding.

Since no appeal is provided for the relator Burns from the adverse rulings and decision rendered against him by said Mayor and City Council the dissatisfied relator was forced to seek a writ of review from the District Court of Park County, Montana.

Upon the application therefor of the relator Burns, the District Court for Park County issued its writ of review and thereafter reviewed the typewritten transcript of the papers, records, exhibits, files and proceedings had before Mayor Ommundsen and the City Council of Livingston, but no new or additional evidence to that theretofore submitted to the Mayor and City Council was presented to such District Court. After reviewing such record of such proceedings had before said Mayor and City Council the District Court rendered a judgment and decree vacating the writ of review which it had theretofore issued and from such judgment and decree of the District Court the instant appeal was taken to the Supreme Court.

The record on this appeal is identical with the record furnished to the District Court in compliance with the writ of review issued out of such court. In other words all of the evidence, papers, records, exhibits, files and proceedings that had been presented to and considered by the District Court have been presented to and are now before this, the Supreme Court, for examination and review, and we are here called upon to examine and to evaluate the entire proceedings affecting the relator Burns that were had and done by the Mayor and the City Council of Livingston in ordering the discharge and dismissal of Fire Chief Herbert P. Burns.

In view of this court's responsibility in this most important and far reaching litigation, I am of the opinion that the essential facts must be carefully stated and the statutes and decisions determinative of this appeal be reviewed.

The State of Montana, on the relation of Herbert P. Burns, on January 28, 1963, presented to and filed in the District Court for Park County, Montana, relator's duly verified petition seeking a writ of review to be directed to the following named respondents, viz.: The City of Livingston, Montana, a duly organized and existing municipal corporation being a city of the State of Montana of the second class and having the mayor-aldermen type of government; George Ommundsen, the duly elected, qualified and acting Mayor of said City of Livingston; The City Council of the City of Livingston; and the following duly elected and qualified aldermen and members constituting the governing council of said City of Livingston, namely: H. P. Waldum; H. C. Nelson; D. K. Latsch; H. C. Snow; F. A. McGonegal; Victor C. Eastep; M. W. Orden and A. M. Lueck.

In his petition the relator, Herbert P. Burns, requested that the District Court first review and then annul the action of the respondents in ordering the discharge and dismissal of the relator, Herbert P. Burns, from the Livingston Fire Department effective as of January 10, 1963.

On order of the District Court for Park County made on January 28, 1963, a writ of review was that day issued out of such District Court and then duly served upon the respondents who made return thereto by certifying to and filing in said District Court a transcript of the papers, records, exhibits, files and proceedings, including a certified copy of the minutes kept and entered by William C. Anderson, the City Clerk of Livingston, of the proceedings had and done at four separate meetings of the city council, each called and presided over by Mayor George Ommundsen and each concerning and involving the relator, Herbert P. Burns, beginning with what respondents have termed an "Adjourned meeting of City Council held August 13, 1962," and concluding with a specially called special meeting held during the evening of January 10, 1963.

Among the papers and records certified and delivered to the District Court is a transcript of the testimony and evidence

adduced on behalf of, as well as against, the relator, Herbert P. Burns, at the special meeting of the City Council held on January 10, 1963, as such testimony and evidence was taken and recorded by a duly qualified court reporter there in attendance at the instance of the respondents.

After having been supplied with the aforesaid duly certified transcript of the proceedings to be reviewed, and after having considered the briefs presented to it by both the relator and the respondents, the District Court for Park County, on June 21, 1963, made and caused to be filed its judgment wherein it denied the relator Burns any relief and ordered and adjudged that the writ of review theretofore issued by it, be quashed, vacated and set aside and that the respondents' motion and resolution purporting to discharge and dismiss the relator Burns from the Livingston Fire Department effective as of January 10, 1963, be affirmed.

This appeal is from such District Court's judgment and decree.

On January 10, 1963, and for approximately twelve years prior thereto, the relator, Herbert P. Burns, was a member of the organized fire department of the City of Livingston, Montana. For approximately the last four or five of those years the relator Burns was the duly appointed, constituted, qualified and acting Fire Chief of such fire department.

During a period commencing prior to August 13, 1962, and continuing to and including January 10, 1963, the respondent Ommundsen was the duly elected, qualified and acting Mayor of the City of Livingston, and during this same period of time Alderman H. P. Waldum, Alderman H. C. Nelson and Alderman D. K. Latsch were the three duly appointed, constituted and acting members of the City Council who comprised and constituted the Fire and Police Committee of such City Council.

*INQUISITION IN ATTEMPT TO DEMOTE FIRE CHIEF.* On August 13, 1962, at what is labeled by the City Clerk as an "Adjourned Meeting of the City Council" held on that date,

Mayor George Ommundsen advised the City Council that the last above-named three Aldermen, then constituting and comprising the Council's Fire and Police Committee, had recommended that the relator, Herbert P. Burns, be demoted from his position of Fire Chief to the rank of fireman and that Mayor Ommundsen be instructed to have the City Attorney of Livingston prepare the necessary charges in writing, and that when so prepared, a copy of such written charges be served upon Fire Chief Burns "specifying September 4, 1962, as the time that public hearing will be heard." See section 11-1903, R.C.M. 1947.

The only evidence that was before the District Court for Park County or that has been submitted to this Court on the instant appeal, as to the proceedings had and done concerning the relator, Herbert P. Burns, at or during the "Adjourned Meeting of the City Council" so held on August 13, 1962, is such as is shown in the written report of such meeting, made and entered by City Clerk William C. Anderson, as same appears in the official journal and minute book of the Livingston City Council of that date. Such minutes read:

"CITY OF LIVINGSTON
"Livingston, Montana

"March 26, 1963

"From Office of City Clerk
"To Whom It May Concern:

"I, Wm. C. Anderson, the duly qualified and acting City Clerk, of the City of Livingston, Montana, do hereby certify and swear that the following is a true copy of minute entries pertaining to City of Livingston vs. Herbert P. Burns.

"Minutes of Adjourned Meeting of City Council held Aug. 13, 1962:

"Mayor Ommundsen then advised the City Council that it was the recommendation of the Fire and Police Committee that Mr. H. P. Burns be demoted from the position of Fire Chief to Fireman and that the Mayor be instructed to have the City

Attorney prepare the necessary charges and a copy be served on Mr. Burns, specifying September 4, 1962, as time that public hearing will be heard.

"Discussion was had on this matter between the Mayor and Mr. Burns, who was present and also questions asked by members of the City Council were answered at this time as to what the charges would constitute. Mr. Burns was informed it was his prerogative and privilege to secure legal counsel so defense may be made by him as to whether the charges are justified.

"Motion was made by Alderman Waldum seconded by Alderman Latsch that recommendation of the Fire and Police Committee be accepted. Motion carried."

It is the *law* of Montana that: "The mayor is the presiding officer of the council *must sign the journals thereof* and * * * decide by his vote all ties, and has no other vote." Section 11-803, Revised Codes of Montana of 1947. Emphasis supplied.

There is no evidence in the record before this court that Mayor Ommundsen, at any time affixed his signature to any of the journal entries purporting to set forth the minutes of the following council meetings involving and purporting to report the proceedings had and the charges made against Fire Chief Burns, namely: (1) the "Adjourned Meeting" held August 13, 1962; (2) the regular meeting held September 4, 1962; (3) the "Special Meeting" held January 10, 1963; and finally (4) the regular meeting held February 4, 1963, being after the District Court for Park County had accepted and exercised jurisdiction by making its order for the issuance of the writ of review and by causing such writ to issue and to be served upon the respondents herein.

At no time prior to or at or during the holding of the meeting of August 13, 1962, did the respondent Mayor suspend Fire Chief Burns nor did said Mayor or any other person at any time, prior to or at or during such meeting, furnish the relator Burns with any writing or any copy of any writing setting forth any charges or any reasons for the attempted demotion in rank of

Fire Chief Burns, or setting forth any reason or reasons for the action taken against said relator or charging any neglect by relator of any duty or accusing relator with the violation of any designated, described or specified rule or regulation of the Fire Department of the City of Livingston, of which department the relator Burns was then the Fire Chief, all as was and is provided for and required by the provisions of Section 11-1903, Revised Codes of Montana of 1947.

*THE LAW GOVERNS AND CONTROLS.* Fire protection is a matter of statewide concern. The power of a municipality and of its mayor and aldermen to deal with the subject must be, and it is, derived from the Legislature through legislative enactment.

In the lawful exercise of its legislative power the Legislature of the State of Montana has enacted into law certain statutes providing for the *organization, management* and *control* of the numerous fire departments that exist throughout the State of Montana, which statutes likewise are designed to assure and provide for the proper, fair, equitable and just treatment and protection of the members of such organized fire departments.

Chapter 19, Volume 1, Part 2 of the Revised Codes of Montana of 1947, so far as pertinent here, provides:

Section 11-1901. "There shall be in every city and town of this state a fire department, *which shall be organized, managed and controlled* as in this chapter provided, *which shall in all respects be applicable to and shall govern and control fire departments in every such city* or town organized under whatever form of municipal government * * *." Emphasis supplied.

Section 11-1902. "Such fire department, when established, may consist of one chief of the fire department, as many assistant chiefs of the fire department, and such number of firemen as the council * * * may from time to time provide, * * *. The compensation of the chief of the fire department and assistant chiefs of the fire department and firemen, in cities * * * where the council * * * shall establish a paid fire department * * * shall

be fixed by ordinance. The mayor * * * shall nominate, and, with the consent of the council * * * appoint the chief of the fire department, and assistant chief or chiefs of the fire department, and all firemen, and each appointment shall be first made for a probationary term of six (6) months, and thereafter the mayor * * * may nominate, and, with the consent of the council * * * appoint such chief and assistant chief or chiefs of the fire department and firemen, *who shall thereafter hold their respective appointments during good behavior, and while they have the physical ability to perform their duties.* The chief of the fire department, and the assistant chief or chiefs of the fire department, and the firemen, shall not be deemed officers of the municipal corporation in which such fire department is established." Emphasis supplied.

Section 11-1903. *"The mayor * * * may suspend the chief* and assistant or any fireman of the fire department *for neglect of duty or a violation of any of the rules and regulations of the fire department;* the chief of the fire department may suspend the assistant chief of the fire department or any fireman, and the assistant chief of the fire department may suspend any fireman for a like cause. *In all cases of suspension the person suspended must be furnished with a copy of the charge against him in writing, setting forth reasons for the suspension, and such charges must be presented to the next meeting of the council * * * and a hearing had thereon, when the suspended member of the fire department may appear in person or by counsel and make his defense to said charges;* if such charges are found proven by the council * * * the council * * * by a vote of a majority of the whole council * * * may impose such penalty as it shall determine the offense warrants, *either in the continuation of the suspension for a time limited, or in the removal of the suspended person from the fire department; should the charges be not presented to the next meeting of the council * * * after the suspension, or should the charges be found not proven by the council * * * the suspended person shall be reinstated and be entitled to*

*his usual compensation for the time so suspended.* This act shall apply to organized fire departments in every city and town of the state of Montana regardless of the form of government under which said city or town may be operating or may at any time adopt." Emphasis supplied.

Section 11-1904. "Should the council at any time reduce the number of firemen in the fire department, those most recently appointed shall be selected for retirement from the fire department, *and the city or town clerk shall keep a list of such retired firemen,* and should the number of firemen be again increased by the council, the men on said list shall be called into service, the longest service firemen being first selected for service in the fire department." Emphasis supplied.

Section 11-1906. *"Duties of chief and assistant chief of fire department. The chief of the fire department shall have sole command and control over all persons connected with the fire department of the city or town, and shall possess full power and authority over its organization, government, and discipline, and to that end may from time to time establish such disciplinary rules and regulations as he may deem advisable,* subject to the approval of the city or town council; he shall have charge of and be responsible for the engines and other apparatus, the property of the town or city furnished the fire department, and see that they are at all times ready for use in the extinguishing of fires. The assistant chief of the fire department shall aid the chief in the work of the department and in his absence shall perform his duties." Emphasis supplied.

The procedure and proceedings had and done in the meeting held by the respondent City Council, Mayor and Aldermen on August 13, 1962, are, by the City Clerk's certified minutes and report of such meeting, shown to have been most irregular, and contrary to the form, force, effect and requirements of sections 11-1901, 11-1902, 11-1903, 11-1904, and 11-1906, Revised Codes of Montana, 1947, supra, and, by reason thereof the action then and there had and done in a futile and unlawful attempt to de-

mote the relator, Herbert P. Burns, "from the position of Fire Chief to Fireman," should be set aside as being null, void and of no effect. Compare: Wood v. United States, 75 U.S.App.D.C. 274, 128 F.2d 265, 141 A.L.R. 1318; Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733; Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, decided June 15, 1964, and Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed 2d 678, decided June 15, 1964.

In Volume 8, Wigmore on Evidence, 3rd Edition (1940), § 2251, at page 308, it is said: "Under any system which permits John Doe to be forced to answer on the mere suspicion of an officer of the law, or on public rumor, or on secret betrayal, two abuses have always prevailed and inevitably will prevail; first, the petty judicial officer becomes a local tyrant and misuses his discretion for political or mercenary or malicious ends; secondly, a blackmail is practiced by those unscrupulous members of the community who through threats of inspiring a prosecution are able to prey upon the fears of the weak or the timid. The modern system of formal presentment needs no defense. In this aspect the privilege against self-crimination is, in history and in policy, its just compliment, in so far as it exempts all persons from being compelled to disclose their supposed offenses before formal process of charge is had."

*"SPECIFICATIONS OF CHARGES."* On August 27, 1962, Fire Chief Burns was served with a typewritten paper bearing that date and entitled "Specifications of Charges Against Herbert P. Burns." The specifications were signed by the respondents D. K. Latsch, H. P. Waldum and H. C. Nelson as "Fire and Police Committee of the City of Livingston, Montana." Such specifications of charges pertained solely to the relator's functions, duties and conduct as Fire Chief and they were most general in character avoiding and omitting to state the particular facts, if any there be, and in lieu of such facts, charging in most general terms the fire and police committee's unsup-

ported, bald conclusions that the relator Burns "has been guilty of neglect of duty, misconduct in office, conduct unbecoming the Chief of the Fire Department, and conduct such as to bring reproach upon the Fire Department of the City of Livingston, Montana, in that:

"I. That the said Herbert P. Burns, as Chief of the said Fire Department, has failed and neglected to keep proper and adequate records and accounts pertaining to the members of the Fire Department, and of himself, as Chief thereof.

"II. That he has failed to exercise proper leadership and initiative in maintaining the discipline, morale, good order and proper conduct of the officers and firemen, constituting the Fire Department.

"III. That on numerous occasions his personal conduct has been such as to constitute conduct unbecoming a fire department chief, misconduct in office, and conduct such as to bring reproach upon the Fire Department of the City of Livingston, Montana.

"All of which is contrary to the form, force and effect of Section 11-1902, Revised Codes of Montana, 1947, and constitutes neglect of duty, misconduct in office, and conduct unbecoming a Fire Chief, and conduct such as to bring reproach upon the Fire Department of the City of Livingston, Montana."

The respondents Latsch, Waldum and Nelson concluded their "Specifications of Charges" with the request that the City Council "hold and conduct a hearing on the above charges at the *next regular* meeting of the City Council to be held on September 4, 1962, at the Council Chambers at the City Hall, Livingston, Montana, at the hour of eight o'clock P. M., or as soon thereafter as the matter may be heard." See sections 11-1902 and 11-1903, R.C.M.1947, supra.

*HEARING ORDERED FOR SEPTEMBER 4, 1962.* In compliance with the above request of Aldermen Latsch, Waldum and Nelson, constituting the Fire and Police Committee of the City of Livingston, Mayor Ommundsen, on August 27, 1962,

issued and caused to be served upon Fire Chief Burns, a written order directing that a hearing on said matter be held "at the *next regular* meeting of the City Council to be held on September 4, 1962, at the Council chambers at the City Hall, Livingston, Montana, at the hour of eight o'clock P. M. or as soon thereafter as the matter may be heard."

*SEPTEMBER 4th, 1962 HEARING VACATED.* On September 4, 1962, at the appointed hour, Attorney David B. Fitzgerald appeared before the City Council on behalf of the relator, Herbert P. Burns, but the hearing, on the written "Specification of Charges" that had been ordered and scheduled for that date was not then held because of the illness of City Attorney Earl C. Ammerman and such scheduled hearing was called off and vacated without a day being set for hearing, but subject to being heard upon five days written advance notice to be given by the respondent City Council of Livingston to the relator, Herbert P. Burns.

At no time during the months of September, October, November or December in the year 1962 did the City Council of Livingston or any of the respondents give any notice to the relator Burns or to the latter's counsel of the setting or fixing of any new day or time for the hearing of respondents' written "Specifications of Charges" against Herbert P. Burns.

*NOTICE OF HEARING CHARGES.* On January 5, 1963, Mayor Ommundsen made, signed and caused to be served upon the relator Burns a typewritten notice, which, omitting the title of the proceeding but including the return showing personal service upon the relator Burns, reads:

"NOTICE OF HEARING

"TO: Mr. HERBERT P. BURNS and to his attorney, MR. DAVID B. FITZGERALD.

You will please take Notice that the Specifications of Charges filed against HERBERT P. BURNS as Fire Chief of the City of Livingston, County of Park, State of Montana, on the 27th day of August, 1962, will be heard before the City Council of

the City of Livingston, State of Montana, *as provided by Chapter 19 of Title 11 of the Revised Codes of Montana, 1947*, at the Council Chambers at the City Hall in the City of Livingston, Montana, on Thursday, the 10th day of January, 1963, at the hour of 8:00 o'clock P. M. of said day at which time you, HERBERT P. BURNS, may make your defense to said charges. [Emphasis supplied.]

"DATED this 5th day of January, 1963.

/s/ "George Ommundsen
Mayor of the City of
Livingston

"I served the above notice on Mr. Herbert P. Burns at 9:50 P. M. Jan. 5, 1963.

/s/ "R. L. Oakley"

*SPECIAL MEETING OF JANUARY 10, 1963.* At the hour of 8:00 o'clock P. M. on January 10, 1963, Mayor George Ommundsen, called to order *a special meeting* of the City Council of the City of Livingston, Montana, whereupon, the City Clerk, William C. Anderson, called the roll of the members and reported the following named aldermen as being present, viz.: D. K. Latsch, Rev. H. P. Waldum, H. C. Nelson, V. C. Eastep, F. A. McGonegal, M. W. Van Orden and Dr. H. G. Snow. The one alderman absent from such *special meeting* was Dr. A. M. Lueck.

In addition to Mayor Ommundsen, City Clerk Anderson and the seven named aldermen present and responding to the roll call, the following persons, all residents of Livingston, Montana, were also present at said *special* meeting, viz.: Court Reporter Donald J. Franck; Acting City Attorney Jack Yardley representing all the respondents, and Attorney David B. Fitzgerald, representing the relator, Herbert P. Burns, who likewise was present.

Following the roll call of the aldermen and the City Clerk's report thereon, the *special* meeting and hearing of January 10, 1963, then proceeded as follows:

"CLERK ANDERSON: This is a call to the members of the City Council of the City of Livingston, Montana. Gentlemen, you and each of you are hereby notified that a *special meeting* of the City Council of the City of Livingston, Montana, will be held on Thursday, the 10th day of January, 1963, at 8:00 o'clock P. M., at the council chambers in the city hall building of the City of Livingston, Montana, for the following purpose: Specifications of charges filed against Herbert P. Burns as Fire Chief of the City of Livingston, County of Park, State of Montana, to be heard before the City Council of the City of Livingston, State of Montana, as provided by Chapter 19 of Title 11 of the Revised Codes of Montana, 1947. Signed: George Ommundsen, Mayor, Attested: William C. Anderson, City Clerk. Dated this 9th day of January, 1963.

"Waiver of Notice: We, the undersigned members of the City Council of the City of Livingston, Montana, do each and all acknowledge the service of the attached notice of *special meeting and waive time and notice of time* as attested by our signatures hereto affixed; V. C. Eastep, Don K. Latsch, F. A. McGonegal, Harry C. Nelson, Dr. H. G. Snow, Hazel Van Orden, H. P. Waldum. It is signed Alfred M. Lueck, M. D., not able to attend.

"Notice of Service: I, the undersigned Chief of Police of the City of Livingston, Montana, hereby certify and swear that I served the attached notice of *special meeting* of the City Council of the City of Livingston, Montana, on the above-named members of the City Council of the City of Livingston, Montana, on the 10th day of January, 1963, before the hour of 8:00 o'clock P. M. by delivering thereto this copy of the call and witnessed their signature thereto. Signed Bernard O. Blankenship, Chief of Police, City of Livingston, State of Montana. Dated this 9th day of January, 1963." Emphasis supplied.

Mayor Ommundsen then stated:

"Gentlemen, this is the time set for the hearing of the *written charges* against Herbert P. Burns, Fire Chief of the City of Liv-

ingston, which was served upon Herbert P. Burns on the 27th day of August, 1962, *under the provisions of Chapter 19, Title 11 of the Revised Codes of Montana, 1947."* Emphasis supplied.

Mayor Ommundsen then read aloud from the aforesaid *written* "Specifications of Charges" a copy whereof had been served upon Fire Chief Burns on August 27, 1962.

*"THIS IS NOT A COURT OF LAW."* Following his reading aloud of the written "Specifications of Charges" of August 27, 1962, Mayor Ommundsen addressed those there assembled as follows:

''Gentlemen, at this time *this is not a court of law.* This is a hearing that is accorded to hear the defense of Mr. Herbert P. Burns. I intend to conduct the meeting to the very best of my ability to be fair to bring out all the points pertinent to these questions. If at any time you gentlemen wish to call any witness to have anyone heard, that is your privilege. Mr. Yardley, do you want to make any statement? Mr. Fitzgerald?"

Mr. Fitzgerald, as counsel for the relator Burns, accepted the invitation thus extended to him to state his objections to the hearing and the proceedings and particularly to the "Specifications of Charges" against Herbert P. Burns that had been served upon the relator Burns on August 27, 1962.

*RELATOR'S OBJECTIONS TO HEARING, CHARGES AND PROCEEDINGS.* Mr. Fitzgerald then made and placed in the record at the very outset of the hearing his objections as follows:

"MR. FITZGERALD: Yes, if I might, at this time before we start.

"Mr. Mayor and Gentlemen of the Council, in behalf of Mr. Herbert P. Burns I would like to object at this time to any hearing under this specifications of charges so called as filed here. They purport to be drawn under section 11-1902 of the Revised Codes * * * That statute provides that the Mayor may suspend the Chief and any assistant or firemen in the fire department for neglected duty.

"Further, that [in] all cases of suspension the person suspended must be furnished with a copy of the charges against him, *in writing,* setting forth reasons for the suspension, and such charges *must be presented at the next meeting of the council* and a hearing had thereon where the suspended member may appear in person and make his defense. If such charges are found proved by the council the council may by a vote of the majority of the whole council impose such penalty as it shall determine the offense warrants.

"There has been no suspension of Mr. Burns here and I don't believe that there can be any charges heard by this council until there has been a suspension.

"The minutes of the council meeting relative to that on August 13th were that Mayor Ommundsen advised the City Council that it was a recommendation of the Fire and Police Committee that Mr. H. P. Burns be demoted from the position of Fire Chief to fireman and that the Mayor be instructed to have the City Attorney to prepare the necessary charges and a copy served on Mr. Burns specifying September 4, 1962 as a time when the public hearing would be heard.

"I don't believe that that is any compliance of a suspension made by the Mayor of Mr. Burns, and if that be the case, and if I am correct, there can be no charges heard at this meeting tonight.

"My second point in regard to the specifications of charges is that they are so general that they don't advise in fact Mr. Burns of the charges against him. They are drawn on the terms of the statute and they are very general.

"My third point is that I don't believe there is a quorum of the council present that is able to sit in judgment because the charges were made by three members of this council. And I don't think that they can sign charges against a person and then sit in judgment of those charges. If that is true there are only four members of the council here. So we object further on that ground with proceeding with this matter tonight.

"In general those are my objections.

*     *     *     *     *

"MR. FITZGERALD. I just wanted to make these points for the record. Having made those, also, for the record I would like to file this answer to charges which constitutes just a specific denial of the charges in general language, just to get them in the record so we have an issue to work on here."

*ANSWER TO CHARGES.* After having made the foregoing specific objections on behalf of the relator Burns, his counsel David B. Fitzgerald, served and filed relator's written answer to the "Specifications of Charges" theretofore served upon the relator, which answer, omitting the formal parts thereof, reads:

"ANSWER

"COMES NOW Herbert P. Burns, the duly appointed Chief of the Fire Department of the City of Livingston, Montana, and specifically denies each and all and every of the 'Specifications of Charges Against Herbert P. Burns' heretofore filed before the City Council of the City of Livingston, Montana, and having hereby answered said charges does request that said Specifications of Charges and each and all of them be dismissed. (Signed) Herbert P. Burns."

Following the service and filing of relator's above formal answer to the written charges that had been served upon him on August 27, 1962, the relator Burns was then confronted with three brand new and different charges, no written copy of which was ever furnished to either the relator or his counsel and of which the mayor and council at no time acquired the necessary jurisdiction to hear and determine.

*YARDLEY'S SUGGESTIONS.* Notwithstanding that Acting City Attorney Yardley and Mayor Ommundsen were then fully aware of the fact that the proper procedure provided by statute for holding and conducting the hearing then in progress was and is the procedure provided in sections 11-1902 and 11-1903 of Chapter 19 of Title 11, of the Revised Codes of Montana of 1947, which, among other things provide that the person ac-

cused or suspended "must be furnished with a copy of the charge against him in writing, setting forth reasons for the suspension" (section 11-1903, R.C.M.1947), yet, Acting City Attorney Yardley boldly *suggested,* at this stage of the hearing, that Mayor Ommundsen then and there bring forth and present to the City Council three certain wholly new and different charges than those made in the original written "Specifications of Charges Against Herbert P. Burns" that had been served and filed on August 27, 1962, and this, despite the fact that both the Acting City Attorney and the Mayor then well knew that neither the relator Burns nor his counsel, Attorney Fitzgerald, had at any time been supplied or furnished with any copy *in writing* of any of such three new and different charges against the relator Burns that Acting City Attorney Yardley *suggested* that the Mayor present and then produce witnesses to establish.

The court reporter's transcript of the hearing shows the following *suggestions,* advice and comments there made by Acting City Attorney Jack Yardley, viz.:

"MR. YARDLEY: Let me *suggest* this Mr. Mayor, you have certain charges that have come to your attention. I am going to *suggest* this, Dave, that the Mayor read certain information that has come to his attention, just to read it, and then we are going to produce certain witnesses to substantiate other portions of this. * * *

"MR. YARDLEY: Also, it is our thought that any member of the Council that has any questions to direct to any witnesses they should do that, and if there is no witness produced that they think should be here that they should request that. *Now, that's a little bit similar to a coroner's jury.* Also, the Mayor is authorized to give oaths. If there are any objections he'll have to rule upon them, but he will administer oaths to any witness. I would *suggest,* Mr. Mayor, that you read the information you have and then we will develop this case with our other witnesses." Emphasis supplied.

*THE LAPSED DRIVER'S LICENSE CHARGE.*

"MAYOR OMMUNDSEN: Under numerous occasions his personal conduct has been such as to constitute conduct unbecoming a fire department chief, misconduct in office, and conduct such as to bring reproach upon the fire department of the City of Livingston, Montana. *I find that you did permit your driver's license to lapse.* Emphasis supplied.

"MR. FITZGERALD: I am going to have to object to this form, if the Council is going to testify to facts, I'd have to ask that they be sworn, Mr. Yardley.

"MR. YARDLEY: We have the problem of who would administer the oath to him, Dave. I don't know who is qualified to do that. *The only one I know that is present here that is qualified to administer oaths is the Mayor* and he is the one under our position that made the suspension, and actually it will have to be something that he has developed through his own investigation. Emphasis supplied.

"MR. FITZGERALD: Subject to my objecting, you go ahead. I want the objection noted."

To Attorney Fitzgerald's objections to allowing the Mayor or the members of the Council to testify and relate their respective versions of the facts involved without being first duly sworn as a witness, neither the Mayor nor the Acting City Attorney paid any attention whatever, whereupon relator's counsel preserved his objection by asking that such objection be noted in the record.

Who then and there present was qualified to administer the oath to Mayor Ommundsen? The answer is simple.

City Clerk William C. Anderson was present. Subdivision 10 of section 11-805, R.C.M.1947, makes it the duty of the City Clerk "To take and administer oaths, but must not charge or receive any fees therefor."

Donald J. Franck, a Notary Public and the official Court Reporter for the Sixth Judicial District of the State of Montana was present and reporting the hearing. At page 50 of

the transcript in the instant appeal to this court, Donald J. Franck certified that in January 1963 he was a notary public whose three year commission would not expire until November 23, 1963.

David B. Fitzgerald, Attorney at Law and Notary Public, was present. His notary commission, then in force, will not expire until September 18, 1965.

Acting City Attorney Jack Yardley, who was also a notary public, was present. He possessed a brand new notary commission issued on January 8, 1963, being but two days prior to the hearing then being held, which commission will not expire until January 8, 1966.

For the powers and duties of a notary public under the law in Montana see subdivision 3 of Section 56-104, R.C.M.1947. The Mayor, addressing his oral charges and remarks to the relator, Herbert P. Burns, proceeded as follows:

MAYOR OMMUNDSEN: *"I find that you did permit your driver's license to lapse. * * * That your birth date is February 21, 1922. You had a driver's license issued to you on November 20, 1953; your driver's license expires—not necessarily that one, but it expired February 21, 1961. Your new license, you took a test on that on January 24, 1962. The license was mailed to you on February 6, 1962. You were without a valid driver's license from February 21, 1961, until February 6, 1962, or 15 days short of one year. * * * Your defense?"*

At this stage of the hearing and, at the direction of Acting City Attorney Yardley, Mayor Ommundsen then and there administered the oath to the relator, Herbert P. Burns, who, after being thus duly sworn, testified:

"MR. BURNS: I have no defense against that, no. I know I didn't have a driver's license. I had a permit for about three months at that time but I admit I didn't have a driver's license.

"MR. YARDLEY: May I suggest if any of the councilmen have any questions to present them too at this time. I recognize this is rather informal, but there is no procedure set up for it

to my knowledge. If you have any questions if you would, for the benefit of the court reporter, if he does not know you if you would identify yourselves and ask your question."

The first oral "charge" made by Mayor Ommundsen against the relator, Herbert P. Burns, was taken in shorthand by Donald J. Franck, a duly qualified official court reporter who certified that such oral "charge" was made in these words, namely: "I find that you did permit your driver's license to lapse." This amounts to no charge at all.

It is no crime or offense in Montana to "permit your driver's license to lapse" nor does one forfeit his position as Fire Chief of a City Fire Department by permitting his "driver's license to lapse."

Apparently, after the hearing of January 10, 1963, had been concluded the city officials discovered that the Mayor's first oral "charge," above quoted, was no charge whatever, hence, when entering the minutes of such hearing in the journal those entrusted with the performance of such task changed the above quoted first oral "charge" to read thus:

"Mayor Ommundsen read various charges against Mr. Herbert P. Burns: * * *

"(3) That he had operated City Vehicles and his own vehicle for a period of eleven (11) months without a valid Montana driver's license."

This change of the Mayor's first oral "charge," that wholly failed to charge any unlawful act whatever to a "charge" which accused the relator of having committed a series of misdemeanors would never have been made had the respondents complied with the Legislature's mandate which requires that the person accused "must be furnished with a copy of the charge against him *in writing*." Section 11-1903, R.C.M.1947.

The first oral "charge" made at the hearing was and is as taken in shorthand, transcribed and then certified to by the court reporter who supplied the transcript that is filed in this court, and not as was changed and altered for the minutes of

the hearing of January 10, 1963, that were entered in the City Council's journal.

*THE CAVE BAR CHARGE.* Next, Mayor Ommundsen, without having complied with the requirements of section 11-1903, supra, and without having furnished the relator Burns with a copy in *writing* of the new and additional charges he was about to present, made the following wholly unanticipated oral charges, accusations and statements concerning the relator Burns as he was being examined and interrogated by both the Mayor and by the Acting City Attorney Yardley, namely:

MAYOR OMMUNDSEN: "You were and are a part owner of the Cave Bar that has twice been convicted by the State Liquor Board of selling liquor to minors and also has been closed for a period of time on each offense, which is, we maintain, not conduct for a fire chief or a city supervisor.

"MR. BURNS: My defense on that now?

"MAYOR OMMUNDSEN: Yes.

"MR. BURNS: I am not part owner of the Cave.

"MAYOR OMMUNDSEN: You were at that time.

"MR. BURNS: No, I was not, I never have been.

"MR. YARDLEY: You are a licensee though.

"MR. BURNS: That's right, but I'm not an owner of it; anybody can go on the license.

"MR. YARDLEY: For the record I'll say this, you have to have an interest in that to get on the license I believe.

"MR. BURNS: No, sir, you do not.

"MR. YARDLEY: Well then, you haven't any business on that license.

"MR. BURNS: Anyone can go on a license. There is nothing that says in your liquor laws that a man that is on the license has to own any particular part of that business whatsoever.

"MR. YARDLEY: Well then, let's put it this way, that is immaterial then. * * * There is a duty as a licensee on the liquor or beer license, that is what he is attempting to show.

"MR. BURNS: That's true. * * * But now, wait a minute,

let me put this here, at no time Mr. Mayor, the Fire Committee, or any fire people or any councilman had ever come to me personally and told me he did not want me working at that Cave, or that they did not want me having anything to do with the bar business. You haven't got a letter, you haven't got one person on this council, or on the previous council when you were a councilman, that come to me personally and told me to quit working over there.

"MAYOR OMMUNDSEN: Mr. Burns, I would like to get something clear right now, this Council is not on trial, we are hearing charges on you.

"MR. BURNS: Don't I have a right to answer?

"MAYOR OMMUNDSEN: You have a right to answer, but do not start intimidating anyone. Just as long as we understand that.

"MR. BURNS: Yes, as I said I have not ever been at any time told that I was not to.

"MAYOR OMMUNDSEN: That is the charge and that is your defense.

"MR. BURNS: That's my defense, yes sir.

"MAYOR OMMUNDSEN: You are also charged—

"MR. FITZGERALD: May I inquire here, who is making these charges, the Police and Fire Committee or you?

"MAYOR OMMUNDSEN: Since this is an informal hearing—

"MR. FITZGERALD: I just wondered.

"MAYOR OMMUNDSEN: We felt that you had made your objection that the Fire Committee had entered these charges.

"MR. FITZGERALD: They are actually the charges of the Fire Committee?

"MR. YARDLEY: May I interpose this, the record shows that the charges were made by the Fire Committee. *This is a personal investigation that was conducted by the Mayor.* Emphasis supplied.

"MR. FITZGERALD: Was this done before or after the charges were filed?

"MR. YARDLEY: *These, I assume, had been substantiated since that time.* Emphasis supplied.

"MR. FITZGERALD: Since the charges?

"MAYOR OMMUNDSEN: I had most of these charges, the facts, before at the time of the filing of the charges. I can almost—I have a letter here August the 27th, that was the date that I wrote and got those dates you see; * * *"

*THE DELUXE BAR CHARGE.* Mayor Ommundsen then confronted the relator Burns with the oral charge: "You were in a bar known as the Deluxe Bar after the required closing hour of 2:00 A. M. which was conduct unbecoming a Fire Chief in our estimation."

Fire Chief Burns answered: "That, as I can tell you * * * at that time there wasn't a bar in this town that knew the ordinance that you were to have everyone out of a bar at 2:00 o'clock. * * * I was sitting in there waiting to go for breakfast. There wasn't a drink served after 2:00 o'clock and at that time I can assure you there wasn't a bar in town that knew * * * that that ordinance was actually in effect, that you couldn't have anybody in there after 2:00 o'clock. We always went on the assumption that you could not serve a drink after 2:00 o'clock * * * I was there, I admit it."

The transcript of the record shows the following then occurred.

"COUNCILMAN VAN ORDEN: Could I ask a question here?

"MAYOR OMMUNDSEN: Yes.

"COUNCILMAN VAN ORDEN: Is that a city ordinance or is that a state law?

"MAYOR OMMUNDSEN: That is ordinance 16-9, the complaint was numbered 8280, November 8, 1961. The time was 2:20 A. M. in the morning. The bar was cited for violation of that ordinance.

"MR. FITZGERALD: There was no citation issued to Mr. Burns though.

"MR. YARDLEY: No, that is correct.

"MAYOR OMMUNDSEN: I maintain that is conduct unbecoming an officer.

"MR. YARDLEY: May I interpose to answer Councilman Van Orden's question? This was a city ordinance that was in violation, but no ordinance would be in conflict with the state statute. It would have been under the city ordinance I am sure."

*THE CORRECT ANSWER.* The correct answer to Councilman Van Orden's question is as follows:

At 2:20 o'clock on the morning of November 8, 1961, the relator Herbert P. Burns, was then the duly appointed, qualified and acting Fire Chief of the duly organized Fire Department of the City of Livingston, Montana.

He was seated in the Deluxe bar in Livingston attending to his own business, disturbing no one and waiting for the proprietor to complete the chores attendant upon locking and leaving the tavern and thus permitting the proprietor and Fire Chief Burns to go to breakfast together and there complete their business and conversation.

It has been the *law* in Montana at all times since the 17th day of March in the year 1911, that: "The * * * chief of the fire department of each city * * * where a fire department is established * * * at all reasonable hours *may enter into all buildings and upon all premises within their jurisdiction* for the purpose of examination." See Chapter 148, Section 15, p. 500, Session Laws of Montana of 1911, and also Section 82-1218, R.C.M.1947. Emphasis supplied.

It would appear that the proprietor of the tavern and the Fire Chief each considered 2:20 o'clock A. M. to be a reasonable hour to attend to such matters and business as they were discussing at that time whether it be the condition of the tavern's

fire extinguishers; of the fire escapes; of the wiring in the building or of the building itself.

Regardless of the sort of examination Fire Chief Burns made of the premises or the building or its equipment, at that hour, if 2:20 o'clock A. M. be considered a reasonable hour by the proprietor, as it apparently was, the above-quoted law gave to the Fire Chief the clear right to be there and should the City of Livingston's ordinance "16-9" conflict therewith the statute and not the ordinance governs. The statute gave the Fire Chief the right to enter the building and to be upon the premises. Such is the law.

*GENERAL CHARGE—FAILURE TO KEEP RECORDS.* Mayor Ommundsen next directed his attention to the general charge that the relator Burns as Fire Chief "has failed and neglected to keep proper and adequate records and accounts pertaining to the members of the Fire Department, and of himself as Chief thereof."

In a fruitless attempt to prove such charge Acting City Attorney Yardley called to the witness stand one James J. Roth who, on January 10, 1963, after being sworn as a witness for the respondents testified: For a little over ten years he had been a member of the Livingston Fire Department. He served as Assistant Chief from 1955 to August 27, 1962, during a large portion of which time the relator, Herbert P. Burns, was the Fire Chief. Since August 27, 1962, Roth had been acting as Chief. No regulations had or have been promulgated or posted either by the witness Roth nor by any of the Fire Chiefs who preceded Roth for the members of the department to comply with or follow. There have not been any regulations as such, that is, no list drawn up or anything. Roth testified: "It's mostly a case of a verbal."

When the witness Roth first joined the fire department Chief Cole kept records and thereafter Chief Welling also had records and since August 27, 1962, the witness Roth voluntarily kept records. When asked whether the relator Burns kept

records the witness replied: "Well, he didn't keep records such as I have, no." The witness Roth testified that there is actually no cash money handled in the fire department.

It was in 1959 that the relator Burns was appointed Fire Chief to succeed Chief Welling and according to the respondents' witness, Roth, at that time Mr. Burns, as Fire Chief, kept records as far as maintenance of the truck was concerned. Also, as far as the equipment on the trucks was concerned the men were required to periodically check the equipment, and periodically check the trucks as far as oil, gas, batteries and so forth. See section 11-1906, R.C.M.1947.

The witness, James J. Roth, further testified that while he was acting as Assistant Chief there was considerable griping among the firemen; that "the Chief wasn't there all during the day when they thought he should be. There was considerable griping * * * over the schools that were held. * * * I felt at times that, my own feeling on the subject, that he should have had more disciplinary action taken."

The following proceedings were then had beginning with questions by Acting City Attorney Yardley and answers by the witness James J. Roth, namely:

"Q. Now I am going to ask you for your opinion, from your experience as Assistant Chief under Mr. Burns and as a fireman, was this grouching and dissension among the men from the conduct of Mr. Burns as Fire Chief? A. Will you say that again, please?

"Q. I am sorry to be vague. You testified of certain dissension and grumbling among the men. Now was that in your opinion caused from Mr. Burns as Fire Chief, the way he handled the job? A. Some of it, yes. I think some of it was the fact that, this is my opinion, that he didn't take enough disciplinary action at times that would maybe have stopped a lot of it.

"Q. I mean, the Council would appreciate the fact that it is difficult to pin-point things down.

"MR. YARDLEY: I have no more questions. Do you have something you wanted to ask?

"MR. FITZGERALD: I would like to ask the witness a few questions.

"COUNCILMAN SNOW: May I ask a question?

"MAYOR OMMUNDSEN: Yes.

"COUNCILMAN SNOW: Were you advised to keep books at any time after you had taken over?

"WITNESS ROTH: No.

"Q. And not how you were to keep them or anything? A. No.

"COUNCILMAN SNOW: Thank you.

"EXAMINATION BY MR. FITZGERALD:

"Q. Mr. Roth, isn't it a fact that Mr. Burns has been out of the Department since sometime in June on sick leave? A. July I think, isn't it? Maybe it's June.

"Q. June or July. It was considerably before the 27th of August that he was granted that sick leave? A. Yes, that he has been off the Department. As far as granting sick leave I don't know anything about that.

"Q. Yes. The Council has never given you any directions as to any records to keep at all, is that correct? There has been no system set up? A. No.

"Q. Do you know of any time when anybody received remuneration that they didn't have coming? A. Pardon?

"Q. I understood you to say that it might have been possible that somebody could get some sick leave that didn't have it coming. Do you know of any case where that happened? A. No, I don't.

"MR. BURNS: I have a couple of questions I would like to ask.

"EXAMINATION BY MR. BURNS:

"Q. Mr. Roth, at the time that I took over as Fire Chief was it not true that we were on a 24-hour shift? A. Yes.

"Q. And at that time wasn't it true that we had a meeting

on our sign-in books whether we should have a sign-in book or not because you were here for 24 hours? A. I can't remember whether it was or not.

"Q. Also, you stated now, you're under oath, that nobody has instructed you to keep the sign-in sheets and the sick leave since you took over as acting Chief? A. That's right.

"Q. And also, you stated that the dissension and griping come from all of the men? A. That's right."

Only two persons testified under oath at the special hearing held during the evening of January 10, 1963. These two were Fire Chief Burns and Assistant Chief James J. Roth. Each was called by Acting City Attorney Yardley. Each was administered the oath by Mayor Ommundsen at the request of such Acting City Attorney.

At the conclusion of the testimony of the witness Roth, the relator's counsel Mr. Fitzgerald, stated:

"We have some letters here that I would like to submit as a part of the record. We don't have any oral evidence, but I would like to have the council look these over."

The letters were marked for identification as relator's Exhibits A, B, C, D, and E and then received in evidence. With the formal parts thereof omitted, the letters are as follows:

"A." Letter dated August 21, 1962, from the Lovely Agency of Livingston representing The Home Insurance Company reading:

"This will advise that the Livingston Fire Department and its chief, Mr. Herbert Burns, has always rendered a high degree of cooperation and assistance with all fire damage claims which have been insured through this agency."

"B." Letter dated August 21, 1962, from Superintendent of School District No. 4 reading:

"Dear Mr. Burns:

"You have asked me to make a statement in regard to our working relationship in respect to the public elementary schools.

"I note that during your tenure as Fire Chief you have rec-

ommended such safety measures to secure the greatest safety for the pupils involved. Your work, relative to the public schools has been very satisfactory. I have always found you willing to visit the public schools anytime such a request has been made. You have held regular fire drills, followed by a written report, showing how improvements might be made.

"Personally, I have always found you courteous and co-operative in our associations."

"C." Letter dated September 4, 1962, from Federal Aviation Agency, Systems Maintenance Sector 86, of Livingston, Montna, reading:

"Dear Herb:

"Contrary to the recent criticism you have received on your job I wish to extend my thanks for the excellent service you and the members of the Fire Department have given us at the airport.

"I wish to make special note of the times when you and others have kept a check on the road conditions to the airport during the road construction. If it were not for your conscientious efforts on this point, even though your own time was involved, I do not feel that we could have had adequate fire protection. There have been times that those of us who work here daily have had some difficulty finding the road being used so your desire to keep informed on the fastest direct road is understood and appreciated by us.

"Your cooperation in making the fire inspection of the City building at the airport, though it was out of your jurisdictional area and done on your own time, was very helpful. I also recognize the prompt and courteous service you have performed in repair and recharging Federal Aviation Agency fire fighting equipment.

"In more of a direct personal vein, I offer my thanks for your very fast response to a call for the resuscitator following a boating accident I was in several years ago. If only the time lapse before calling you had been as short as the time it took for

you to reach us I am sure you could have changed an accident into just another incident."

"D." Letter dated September 4, 1962, from Peterson-Dewing Agency (Insurance) of Livingston, Montana, reading:

"Dear Mr. Burns:

"This letter will confirm our telephone conversation of today.

"During your term of office as Chief of the Livingston Fire Department, this office has had several major repair jobs in the business district as a result of the city inspections made by your office. We have had good cooperation from you on these jobs and have had no complaints to make on your handling your office."

"E." Letter dated August 21, 1962, from Principal of Park County High School of Livingston, Montana, reading:

"I have been asked by Mr. Burns to write a letter as to the relationship of the department and the High School.

"Briefly, it consists of conducting one or more fire drills during the year, timing of the exit, and suggestions on improving our time of clearance. A letter has been received following each drill.

"The Fire Department has also taken over the task of inspecting and refilling our fire extinguishers each year.

"We have, at times called upon Mr. Burns for assistance in controlling entrances and exits at basketball games and tournaments and have always received his cooperation and assistance whenever we requested it. The department has, at times, conducted inspections for fire hazards in the building and we have acted upon them insofar as possible."

Montana's Legislature has enacted into *the law* of this state the proper and required procedure that must be followed in cases such as is here presented and such procedure must be employed and followed to give the Mayor and City Council jurisdiction to hear and to determine controversies, such as the one now before this court.

*"Gentlemen, at this time this is not a court of law."* So said Mayor Ommundsen on the evening of January 10, 1963.

Eighteen days later, to-wit, on January 28, 1963, the Mayor and the eight Aldermen found themselves as respondents in the District Court of Park County which is a *court of law.*

Now, somewhat later, the Mayor and the City Councilmen find themselves as respondents in the Supreme Court of Montana which likewise is a *court of law.*

Acting City Attorney Yardley, on January 10, 1963, stated that the holding of the hearing would be *"a little bit similar to a coroner's jury"* but he overlooked the fact that a number of years before, this court ruled that in holding an inquest, the coroner acts judicially and that he too must observe and obey the *law* as it is written.

In State v. Allison, 116 Mont. 352, at p. 355, 153 P.2d 141, at pp. 142, 143, this court said:

"'* * * In holding an inquest the coroner acts judicially. Commonwealth v. Hawkins, 3 Gray, Mass. 463; People v. Devine, 44 Cal. 452; Boisliniere v. Board of County Commissioners, 32 Mo. 375.

" 'A coroner's inquest has been broadly defined as a tribunal charged with the duty of investigating crimes, and, more specifically, as an investigation into the cause of death by a coroner with the aid of a jury. * * * Although an inquest is essentially *a criminal proceeding,* at least from the time when the felonious homicide is established; nevertheless, it is not a trial involving the merits, but rather a preliminary investigation.' (Emphasis ours.) 18 C.J.S. Coroners, § 14, p. 293."

The "Minutes of Adjourned Meeting of City Council held Aug. 13, 1962" fail to show what, if any, charges had been lodged against Fire Chief Burns when he was called on the carpet before the City Council on the night of August 13, 1962, and where he witnessed the adoption of the recommendation and motion of the three aldermen constituting the Fire and

Police Committee that he, the Fire Chief, "be demoted from the position of Fire Chief to Fireman."

Such hearings as were accorded the relator Herbert P. Burns, on August 13, 1962, and on January 10, 1963, could have been patterned after the Court of Star Chamber of England which was abolished by the Long Parliament in the year 1641, or they could have been patterned after the Spanish Inquisition which was abolished in France in 1772, and, at long last, in Spain in the year 1834, or such hearings could have been patterned after the "kangaroo courts" held by inmates of various jails in this country. See Berberick v. City of Topeka, 119 Kan. 552, 240 P. 968, 969, 44 A.L.R. 1135.

In Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, decided June 15, 1964, the Supreme Court of the United States said:

"The shift reflects recognition that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay. Rogers v. Richmond, 365 U.S. 534, 541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760. Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth. * * * The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty, as held in Twining, for such silence.

"* * * It must be considered irrelevant that the petitioner was a witness in a statutory inquiry and not a defendant in a criminal prosecution, for it has long been settled that the privilege protects witnesses in similar federal inquiries.  [Citing cases.]"

In Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678, decided June 15, 1964, the Supreme Court of the United States said:

"We have held today that the Fifth Amendment privilege against self-incrimination must be deemed fully applicable to the States through the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, * * *.

"The privilege against self-incrimination 'registers an important advance in the development of our liberty—"one of the great landmarks in man's struggle to make himself civilized."' Ullmann v. United States, 350 U.S. 422, 426, 76 S.Ct. 497, 100 L.Ed. 511. It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,' 8 Wigmore, Evidence (McNaughton rev., 1961), 317; our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life,' United States v. Grunewald, 2 Cir., 233 F.2d 556, 581-582 (Frank J., dissenting), rev'd 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.' Quinn v. United States, 349 U.S. 155, 162, 75 S.Ct. 668, 673, 99 L.Ed. 964.

"Most, if not all, of these policies and purposes are defeated when a witness 'can be whipsawed into incriminating himself under both state and federal law even though' the constitutional privilege against self-incrimination is applicable to each. [Citing case.] * * *

"In light of the history, policies and purposes of the privilege against self-incrimination, we now accept as correct the con-

struction given the privilege by the English courts and by Chief Justice Marshall and Justice Holmes. [Citing cases.] We reject—as unsupported by history or policy—the deviation from that construction only recently adopted by this court in United States v. Murdock, [284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210], supra, and Feldman v. United States, [322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408], supra. We hold that the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law."

The record now before this court shows: That the respondents failed and omitted to comply with the requirements of sections 11-1902, 11-1903 and 11-1906, R.C.M.1947, being the procedural statutes which here govern. The respondents, having failed to obey and abide by the law, thereby failed to obtain or acquire the jurisdiction essential to the holding of either the hearing held on August 13, 1962, or the hearing held on January 10, 1963. Accordingly, in my opinion the order, judgment and decree of the District Court for Park County ordering and adjudging that the writ of review issued by that court on January 28, 1963, should be quashed, vacated and set aside, and the respondents' motion and resolution of January 10, 1963, purporting to discharge and dismiss the relator Burns from the Livingston Fire Department should be set aside and reversed; the charges against the relator, Herbert P. Burns, here involved should be dismissed; and he should be reinstated as Fire Chief of the Livingston Fire Department and also that he should be compensated and paid for the time lost by reason of the respondents' unlawful proceedings and acts and that the relator Burns should have and receive from the respondents, relator's costs and counsel fees expended in prosecuting this matter in both the District Court for Park County and in this court.